UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD HORTON, JR.,

       Plaintiff,                                  Hon. Ellen S. Carmody

v.

                                             Case No. 1:16-cv-491

COMMISSIONER OF
SOCIAL SECURITY,

       Defendant.
_____/

## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. The parties have agreed to proceed in this Court for all further proceedings, including an order of final judgment. (ECF No. 11). Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

1

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984). As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 37 years of age on his alleged disability onset date. (PageID.235).  He possesses an eleventh grade education and previously worked as an assembler and sales clerk.  (PageID.50-51, 96).  Plaintiff applied for benefits on May 9, 2012, alleging that he had been disabled since April 9, 2012, due to severe headaches, balance issues, memory lapse, and post-concussion syndrome.  (PageID.235-36, 275).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (PageID.129).

Following a March 28, 2013 hearing, ALJ Dawn Groenberg denied Plaintiff's claim for benefits.  (PageID.58-91, 129-40).  The Appeals Council subsequently remanded the matter for further consideration.  (PageID.146-48).  On December 10, 2014, Plaintiff appeared before ALJ Manh Nguyen with testimony being offered by Plaintiff and a vocational expert.  (PageID.92-112).  By the time of this second administrative hearing, Plaintiff had returned to full-time work.  (PageID.41).  Thus, the question before ALJ Nguyen was simply whether Plaintiff was disabled between the dates of April 9, 2012, through October 1, 2013.  (PageID.39).  In a written decision dated February 13, 2015, the ALJ concluded that Plaintiff did not qualify for benefits.  (PageID.38-52).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (PageID.28-31).  Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v.*

---

[1]
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b), 416.920(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. §§ 404.1520(c), 416.920(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors. (20 C.F.R. §§ 404.1520(d), 416.920(d));

4. If an individual is capable of performing her past relevant work, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e), 416.920(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f), 416.920(f)).

*Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that during the relevant time period Plaintiff suffered from: (1) degenerative disc disease of the cervical spine; (2) cephalgia; (3) obesity; (4) carpal tunnel syndrome; (5) blurred vision, amnesia, and auditory hallucination secondary to post-concussion syndrome; (6) schizoaffective disorder; (7) anxiety disorder; and (8) attention deficit hyperactivity disorder (ADHD), severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (PageID.41-44).

With respect to Plaintiff's residual functional capacity, the ALJ determined that between the dates of April 9, 2012, through October 1, 2013, Plaintiff retained the capacity to perform light work subject to the following limitations: (1) he can occasionally lift/carry 20 pounds and can frequently lift/carry 10 pounds; (2) during an 8-hour workday he can sit and stand/walk for 6 hours each; (3) he can occasionally climb ramps and stairs, but cannot climb ladders, ropes, or scaffolds; (4) he can occasionally balance, stoop, and crouch, but cannot kneel or crawl; (5) he can only work on level even flooring; (6) he can frequently reach, handle, and finger; (7) for every 30 minutes of sitting, standing, or walking, he must be able to change position for 5 minutes before resuming the prior position; (8) he will remain on task 90 percent of the workday; (9) he can tolerate occasional exposure to environmental pollutants such as fumes, dust, or smoke, but cannot tolerate exposure to extreme heat or cold; (10) he cannot work around unprotected heights or uncovered unguarded moving machinery; (11) he is limited to simple instructions; (12) he can tolerate occasional changes in the workplace; (13) he cannot interact with the general public as part of his

job duties; and (14) he can occasionally interact with supervisors and co-workers. (PageID.44).

The ALJ found that Plaintiff cannot perform his past relevant work at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned a vocational expert.

The vocational expert testified that there existed approximately 311,000 jobs in the national economy which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (PageID.107-09). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

**I.      The ALJ's RFC Assessment is Supported by Substantial Evidence**

A claimant's RFC represents the "most [a claimant] can still do despite [the

claimant's] limitations." *Sullivan v. Commissioner of Social Security*, 595 Fed. Appx. 502, 505 (6th Cir., Dec. 12, 2014); *see also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule"). Plaintiff asserts that he is entitled to relief on the ground that the ALJ's RFC determination is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ's RFC fails to adequately account for his mental impairments. A review of the medical evidence indicates otherwise.

In early 2012, Plaintiff began experiencing headaches, dizziness, and memory difficulties which he believed were related to his involvement in an auto accident 14 years earlier. (PageID.444). On January 11, 2012, Plaintiff participated in an MRI examination of his brain the results of which were "normal." (PageID.390-91).

On March 19, 2012, Plaintiff participated in a speech/language evaluation which measured Plaintiff's abilities in several areas. (PageID.446-47). In the area of "auditory selective attention," Plaintiff's score was "average." (PageID.446). Plaintiff's "word retrieval fluency" was "moderately impaired." (PageID.446). Plaintiff's "reasoning skills" were "average for inductive style reasoning," but "moderately impaired for deductive reasoning." (PageID.446). Plaintiff's visual processing scores "range[d] from average to high average." (PageID.446). Plaintiff's "immediate recall for novel information is moderately impaired [which] indicates that [he] may require repetition of new information in order to retain it." (PageID.446). In light of Plaintiff's performance, the examiner recommended that Plaintiff participate in a "brief amount of speech/language therapy." (PageID.447).

7

On June 5, 2012, Plaintiff participated in a neuropsychological evaluation. (PageID.492-97). Plaintiff reported that he was experiencing chronic headaches, poor coordination, occasional dizziness, and occasional temporary numbness in his arm and face. (PageID.493). Plaintiff also reported experiencing "times when he blacks out and does not remember what happened." (PageID.493). Plaintiff's performance on a battery of assessments was described as follows:

> There was evidence of intermittent suboptimal performance in the neuropsychological evaluation. While there were several areas of the evaluation in which Mr. Horton's performance was well within the average range, there was notable inconsistency in the test data. Given the atypical assessment results and failure on two symptom validity tests, it is felt that the current assessment results are not a valid indicator of Mr. Horton's current level of functioning. Rather than interpreting each of the tests separately, I will review some of the more significant findings.
>
> Mr. Horton had significant difficulty on a relatively easy forced choice memory test. This is a test that can be completed relatively easily by individuals with documented severe cognitive challenges and dementia. There were some areas of the evaluation in which he performed extremely well, such as on a problem-solving task that requires sequencing, advanced planning, and evaluating his work while it was in progress. On this test, the number of items that he could correctly solve was within the superior range. In contrast, he scored in the impaired range on a card sorting test, even when he was provided with continuous corrective feedback (WCST). He also performed within the average range on the Trail Making Test, which is known to be sensitive to the effects of a traumatic brain injury. Fine motor dexterity, also one of the most sensitive indicators of brain injury, was within normal limits as well. Another notable discrepancy was related to attention testing. His current performance is in contrast to average auditory attention in his recent speech and language evaluation. On the current evaluation, his performance on a formal computerized attention test was severely impaired. With this type of performance it would be extremely difficult for an individual to sustain attention for very long. Yet, he was able to complete a long and relatively boring questionnaire in a highly consistent manner at the end of a long day of testing (MMPl-2-RF)

and did not have any set failures on the WCST.

In order to assess for possible psychogenic overlay, Mr. Horton was asked to complete a standardized questionnaire to assess his mood, coping, and personality style (MMPl-2-RF). Validity scales on the MMPl-2-RF address the possibility for misrepresentation of mental health through self-report. Mr. Horton's validity score panel showed several scores exceeding the recommended cutoffs. There was evidence of possible symptom magnification, particularly with regard to somatic complaints. He endorsed a larger than average number of infrequent responses to the MMPl-2-RF items. While this level of infrequent responding can occur in individuals with genuine psychological problems, it may also indicate over-reporting of symptoms and, therefore, the results are considered cautiously. His profile indicates many somatic complaints, demoralization, and some aberrant perceptions and thoughts (e.g., auditory hallucinations, blank spells, episodes in which he cannot control his movements or speech). These findings are generally consistent with his reports during the interview process.

I also asked Mr. Horton to complete a questionnaire to assess for executive function skills in his daily life (BRIEF-A). His profile indicated that he is concerned about difficulties with initiation, manipulating information in his mind, planning and organizing his approach to activities, and his ability to organize materials. He did not report any difficulties with behavioral regulation. His mother was also asked to complete the BRIEF-A. Her profile suggests that Mr. Horton has problems with initiation, working memory, and planning and organizing activity and problem solving. It does not reflect impaired behavioral regulation, which is often seen after a traumatic brain injury.

**IMPRESSIONS AND RECOMMENDATIONS:**

The results of this neuropsychological evaluation reveal several areas of atypical performance that cannot be easily explained away by the effects of a traumatic brain injury. There is evidence of non-credible responding and possible symptom magnification in select areas of the evaluation. Although atypical findings do not completely rule out the possibility that Mr. Horton is having genuine problems, it does raise significant concerns about the validity of the current assessment results. Based on medical records, it appears that *if* he had an injury to his brain, then it was relatively mild, given that there was no sustained loss of consciousness, findings on neuroimaging, or

> neurological changes. In the majority of cases of mild traumatic brain injury, there is typically complete recovery after 3-6 months. It would be highly unusual for Mr. Horton to be experiencing ongoing cognitive sequelae 12 years after his accident. It is difficult to determine whether there may be psychological factors contributing to reported impairments in his daily functioning given that the MMPl-2-RF was difficult to interpret. Based on his description of his symptoms, it is possible that he may have a Dissociative Disorder, Not Otherwise Specified.
>
> Given the atypical test results, it is difficult to make any firm conclusions about his cognitive status. That being said, I do not believe that cognitive rehabilitation is necessary. In terms of his emotional status, there is suggestion of a dissociative disorder that may require psychiatric and psychological treatment. I would suggest waiting until after his appointment with the neurologist on June 19, 2012 to make any decisions about a referral to psychiatry. It is important to rule out any kind of undiagnosed neurological disorder that could be causing his symptoms. Based on the outcome of the neurological evaluation, then consideration could be given to a referral to a psychiatrist and psychologist/social worker. Counseling services could be helpful in teaching him strategies to improve coping skills and distress tolerance.

(PageID.495-96).

On June 19, 2012, Plaintiff was examined by Dr. Kersti Bruining who concluded that Plaintiff's reported symptoms were "not consistent with traumatic brain injury, nor is it suggestive of epilepsy." (PageID.502). The doctor concluded that Plaintiff was experiencing a thought disorder for which psychiatric treatment was appropriate. (PageID.502).

On July 18, 2012, Plaintiff was examined by Dr. Lawrence Probes with Pine Rest Christian Mental Health Services. (PageID.535-39). The results of a mental status examination were as follows:

> The patient was a casually and neatly dressed and groomed middle-age man who was fully awake and alert throughout the appointment with no signs of overt drowsiness. There was no yawning. Affect was surprisingly normal with spontaneous warmth, smiling, good eye

>       contact and good emotional responsiveness. This did contrast significantly with his reported depression in the severe range on the patient visit questionnaire, as well as in the moderate range on the Beck Inventory. He did not appear to be responding to any unseen stimuli during the appointment, but he does report a combination of visual and auditory hallucinations. During his appointment, he did affirm some delusional preoccupation with feeling that he could imagine other people in the room were talking about him when they do not know him. He has endorsed some delusions of persecution and thought leakage. Affect was stable without lability. There was no tangentiality, blocking or thought derailment. He did not appear suspicious or guarded. Mini Mental State Exam has been previously documented. There was no overt irritability or hostility. There were no death wishes, suicidal thoughts or thoughts of harming others.

(PageID.538).

The doctor diagnosed Plaintiff with schizoaffective disorder, anxiety disorder, and ADHD. (PageID.532). Plaintiff's GAF score was rated as 45. (PageID.532). Plaintiff was started on a regimen of psychotropic medication. (PageID. 533). Subsequent treatment notes by Dr. Probes indicate that Plaintiff's condition improved significantly on medication. On November 14, 2012, Dr. Probes reported that Plaintiff's symptoms were improved. (PageID.572-73). Plaintiff's GAF score was rated as 51. (PageID.573). On December 13, 2012, Dr. Probes reported that Plaintiff was experiencing "continued improvement." (PageID.570-71). Plaintiff's GAF score was rated as 58. (PageID.571). On January 17, 2013, Dr. Probes reported that Plaintiff was experiencing "abatement of depression" and "minimal anxiety," as well as "good tolerability" of his medications. (PageID.569). Plaintiff's GAF score was rated as 65. (PageID.569). On March 22, 2013, Dr. Probes reported that Plaintiff was experiencing "some increase in depression again with persistent mild psychotic symptoms." (PageID.614-15).

The medical evidence reveals that while Plaintiff may have temporarily been experiencing significant symptomatology, his condition responded to appropriate medication and

treatment. The medical evidence does not suggest that Plaintiff was more limited during the relevant time period than the ALJ recognized. Accordingly, the Court finds that the ALJ's RFC determination is supported by substantial evidence.

II.     **The ALJ Properly Evaluated the Opinion Evidence**

On February 15, 2013, Dr. Probes reported that Plaintiff was far more limited than recognized by the ALJ. (PageID.562-65). Specifically, the doctor reported that during an 8-hour workday, Plaintiff's impairments would cause Plaintiff to be off-task "3 hours or more." (PageID.563). The doctor also reported that Plaintiff's impairments would cause Plaintiff to be absent "more than three times a month." (PageID.563). The doctor also assessed Plaintiff's ability to function in 20 categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (PageID.564-65). The ALJ reported that Plaintiff was moderately limited in 14 categories and markedly limited in 6 categories. (PageID.564-65). The ALJ, however, afforded "little weight" to Dr. Probes' opinion. (PageID.49). Plaintiff argues that he is entitled to relief on the ground that the ALJ failed to articulate sufficient reasons for discounting the opinion of his treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v.*

*Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the

ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

In his decision, the ALJ discussed at length the medical evidence. (PageID.44-49). With respect to Dr. Probes' opinion, the ALJ discounted such on the ground that it was "inconsistent with" certain specified portions of the medical record as described in his opinion. (PageID.49). As discussed above, the medical evidence does not support Dr. Probes' opinion that Plaintiff experienced greater limitations than recognized by the ALJ. Accordingly, the Court finds that the ALJ articulated sufficient reasons for discounting Dr. Probes' opinions.

**CONCLUSION**

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date:  February 8, 2017                                              /s/ Ellen S. Carmody
                                                                                     ELLEN S. CARMODY
                                                                                     United States Magistrate Judge